# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| CATHERINE FLYNN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 07 C 5704 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Catherine Flynn, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Ms. Flynn asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Flynn applied for DIB on February 7, 2003, alleging that she had been disabled since June 13, 2001, as a result of "Pre-cancer can3, generalized anxiety, depression." (Administrative Record ("R.") 62, 71). Her application was denied initially and upon reconsideration. (R. 21-25, 28-35). Ms. Flynn continued pursuit of her claim by filing a timely request for hearing on December 30, 2004. (R. 38).

An administrative law judge ("ALJ") convened a hearing on April 20, 2006, at which Ms. Flynn, represented by counsel, appeared and testified. (R. 306-361). In addition, Timothy Bobrowski testified as a vocational expert. (R. 355-58). At the

hearing, after it became clear there was no medical evidence to support Ms. Flynn's claim that she became disabled in June 2001, her attorney amended her alleged onset date to January 2004. (R. 355). On September 26, 2006, the ALJ issued a decision denying Ms. Flynn's application for DIB because she retained the capacity to perform her past relevant work, as well as jobs that exist in significant numbers in the economy. (R. 17-119). This became the final decision of the Commissioner when the Appeals Council denied Ms. Flynn's request for review of the decision on August 3, 2007. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Flynn has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to jurisdiction here pursuant to 28 U.S.C. § 636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Flynn was born on July 25, 1969, making her thirty-seven years old at the time of the ALJ's decision. (R. 62). She is 5' 8" tall and weighs 160 pounds. (R. 71). She has a college degree, and has nearly completed the requirements for a master's degree in community counseling. (R. 76, 318). She has worked as a pre-school teacher, a nanny, a waitress, and a restaurant manager. (R. 72, 89-95).

### B.

### The Medical Evidence

Ms. Flynn confines her contention that she is disabled to her psychiatric problems. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, 2-4).[1]

---

[1] The "Pre-cancer can3" Ms. Flynn mentioned in her application for benefits would seem to be cervical lesions which were said to have no effect on her ability to work. (R. 162-66).

On April 22, 2003, the Agency arranged for her to undergo a consultative psychiatric examination with Dr. John Conran. (R. 166-69). Ms. Flynn said she was seeing a psychiatrist at the time and was taking anti-depressants, Effexor, Paxil, and Trazodone. (R. 166-67). She said her siblings and mother were all bipolar. (R. 166-67). Ms. Flynn complained of depression and generalized anxiety. (R. 166). She slept well when she took her Trazodone. (R. 166). Her mood was sad. (R. 167). She was well-groomed and acted appropriately. (R. 167). Immediate recall and memory were fine, as was remote memory, but she had a sketchy knowledge of current events. (R. 168). She could perform subtraction of serial sevens from 100. (R. 168). Judgment and insight were normal. (R. 168). Dr. Conran noted Ms. Flynn's reported a history of manic depression and stated that she had a somewhat cyclical depression pattern. (R. 169).

On May 6, 2003, at the Agency's request, Dr. Glenn Pittman reviewed Ms. Flynn's medical file consisting of all the medical information submitted by Ms. Flynn in support of her application for disability payments. (R. 170-183). He concluded that Ms. Flynn's activities were mildly restricted, she had mild to moderate difficulty with social functioning, moderate difficulty maintaining concentration, but no episodes of decompensation. (R. 180). She was only mildly limited in maintaining her activities of daily living, in understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, and performing activities within a schedule and maintaining attendance and punctuality. He also found that she was not significantly limited in her ability to make simple work-related decisions, to work in coordination with or in proximity to others without being distracted and to complete a normal work day and work week without interruptions from psychologically-based

3

symptoms or to perform at a consistent pace without an unreasonable number of rest periods. (R. 180-184).

Dr. Pittman concluded Ms. Flynn was not significantly limited in social interaction, the ability to accept instructions and to respond appropriately to criticism from supervisors, to get along with coworkers or peers without exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Pittman thought she could do simple, routine, unskilled work. (R. 185-186).

Ms. Flynn was hospitalized voluntarily for depression from January 14 to January 19, 2004. (R. 252-53). During her stay, however, she said she had not been expecting to be admitted. (R. 198, 195). Her stressors at that time were noted to be two abortions within the previous year and a verbally abusive boyfriend. (R. 214, 225).[2] She was also the victim of what she described as a false arrest involving shoplifting. (R. 225). She had been on anti-depressant medication for three months and had experienced a remission of her depression, but by about the 19th of the month symptoms had returned and she sought treatment. (R. 189). She denied suicidal ideation, but reported a loss of energy, difficulty sleeping, and crying spells. (R. 189). On discharge, she was diagnosed with recurrent mild manic depressive disorder. (R. 189).[3]   Global Assessment of

---

[2] At the hearing, she told the ALJ the boyfriend was out of her life.

[3] Like many cases of this kind, review is hindered by the state of the record, which is comprised of medical records with a jumble of barely legible scrawls assembled in no particular order. For example, Ms. Flynn's four-day hospitalization is represented by seventy pages in the record. (R. 189-259). The very best the parties could manage by way of a summary of that evidence in their statements of facts was two or three sentences. In addition, it was clear at the hearing that both the ALJ and Ms. Flynn's counsel had difficulties with both the organization of the medical records and their legibility, or lack thereof. (R. 310-11, 320-23).

4

Functioning (Axis V) was 60 (R. 189), which indicated moderate difficulty in functioning.[4]

After her discharge, Ms. Flynn continued her psychiatric treatment with visits to the mental health division of her local public health facility. It began with a mental health assessment on February 3, 2004. Ms. Flynn complained of anxiety and thought her treating physician did not monitor her medications properly. (R. 268). She said she had had three abortions. (R. 271). She also complained of family and relationship problems. (R. 268). She appeared to have at least normal intelligence. (R. 269). Her hygiene was good. (R. 270). Her mood was depressed and her affect was guarded. (R. 269). Ms. Flynn denied any suicidal thoughts or hallucinations. (R. 269). She tended to tell contradictory stories during the interview. (R. 269). Diagnosis was major depressive disorder and anxiety disorder, and Ms. Flynn was assigned a GAF score of 58. (R. 272).[5]

Ms. Flynn's subsequent visits were documented by brief notes, mostly regarding the topic of conversation – overwhelmingly, her family. Seldom, if ever, did these notes even hint at any level of her impairment, merely the source of her stress. On February 17, 2004, Ms. Flynn related an incident with her sister and her two children which culminated in a police call. (R. 289). On February 24, 2004, she discussed problems she was having with her brother. He accused her of stealing. (R. 288). She continued to recount stress from her family on March 2, 2004. (R. 288).

_____

[4] The Global Assessment of Functioning or "GAF" assigns a numerical score scale to a "clinician's assessment of the individual's overall level of functioning." *Sims v. Barnhart*, 309 F.3d 424, 427 (7th Cir. 2002)(*quoting* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 30 (4th ed. 1994)). A GAF score of 60 reflects moderate symptoms or "moderate difficulty in social, occupational, or school functioning." *Id.*

[5] Like the score of 60, this score indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning; the range for this level of limitation is 51-60. http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

As of March 23, 2004, Ms. Flynn reported being less depressed. She was applying for jobs, but was worried about leaving her dog home when she was at work. She related an incident where she was falsely arrested for shoplifting; she said she had a receipt for everything. The counselor noted that Ms. Flynn told conflicting stories on occasion. (R. 286). There was another "episode" between Ms. Flynn and her sister on March 30, 2004. (R. 285).

On April 4, 2004, Ms. Flynn underwent a psychological evaluation with psychologist, Christopher Grunow. (R. 303). He conducted an MMPI, the result of which he felt was consistent with a person with family problems, who was somewhat rebellious, and who would adopt a traditional female role. (R. 305). He diagnosed major depressive disorder and assigned a GAF score of 38. Despite the two evaluations of 60 and 58 just weeks earlier, he said the highest score she could have had in the past year would have been 44. (R. 305).[6] On April 6, 2004, Ms. Flynn reported that she remained depressed. (R. 285). A few weeks later, she reported feeling stuck in her misery. (R. 284). The counselor noted she had good insight into her situation but little initiative to act on it. (R. 284).

On May 4, 2004, Ms. Flynn said that shoplifting charges against her were dropped in court. (R. 284). She was not looking for work and was not active. (R. 284). On May 18, 2004, Ms. Flynn related that she had been in a car accident the week before.

---

[6] Scores in the range of 41-50 indicate severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning ( e,g., no friends, unable to keep a job ). Scores in the range of 31-40 indicate some impairment in reality testing or communication ( e.g., speech is at times illogical, obscure, or irrelevant ) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

6

(R. 283). She also had to call the police on her sister again. (R. 283). She understood that her life was consumed by family, but failed to understand that she could change it. (R. 283). Ms. Flynn said she perhaps felt comfortable being "stuck." (R. 283). Ms. Flynn missed several appointments in July and August of 2004. (R. 281-82). She was non-compliant with her medication and took the wrong dosages. (R. 262). On a couple of occasions, Ms. Flynn called in trying to get additional prescriptions for medication she already had. (R. 279-80).

On January 12, 2005, she reported a decrease in her depression and an increase in her motivation, but that it was still not where it should be. (R. 277). On January 24th, she indicated that she had become able to "block out" family stuff. (R. 277). Ms. Flynn said she felt good on January 31, 2005, and was doing all right. (R. 274). In February 2005, Ms. Flynn reported that her life was getting back to normal. (R. 278). She did report that she had to call the police on her ex-boyfriend because he would not stop calling her. (R. 278). Her depressed mood had decreased and she felt focused. (R. 278). There are no further notes of treatment or counseling until October of 2005.

On October 24, 2005, Dr. Salvadore Meccia reported that he had been treating Ms. Flynn since August of 2004. His diagnosis was major depression. (R. 300). Treatment was a prescription for Welbutrin – no other therapy, etc. (R. 300). Her response to treatment had been "fair, guarded." (R. 301). The doctor said that Ms. Flynn's condition did not restrict her daily activities, but did make her feel disorganized and unable to focus. (R. 301).[7] He had no opinion on whether Ms. Flynn would be able

---

[7] The effect or lack thereof of a claimed disability on a plaintiff's daily activities is a factor to be considered in determining disability. *See Heckler v. Campbell,* 461 U.S. 458, 475 (1983)(Brennan, J., concurring); SSR-96-7p; *Sanchez v. Barnhart,* 467 F.3d 1081, 1081 (7th Cir.2006); *Reddick v.* (continued...)

7

to function in a competitive work setting. (R. 301). In fact, the doctor said there were no work-type situations that would exacerbate her symptoms. (R. 300). He did add that she had marked difficulties in maintaining social functioning and maintaining concentration. (R. 302).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At the administrative hearing in April 2006, the ALJ was informed that Ms. Flynn was sufficiently motivated to try to return to the workforce to have "recently" applied for a grammar school teaching fellowship with the Chicago Public Schools that would allow her to teach at the grammar school level. (R. 312-313). Nonetheless, Ms. Flynn said that some days she does not shower and only gets up because she has to take her dog outside. (R. 326-27). She testified that she:

> went from, I mean, makeup every day, shopping, always having my nails done, never missing a day of work, working double shifts at the Hard Rock Café to go to graduate school to this.

(R. 327). She elaborated that "this" was a lack of energy and no interest in anything. (R. 328). She does not even listen to the radio, but she used to go to concerts all the time. (R. 328). She no longer wears makeup, perfume, or jewelry. (R. 329). She wears t-shirts and sweat pants, when she never used to. (R. 329). She said she had gained 60 pounds and weighs 204 pounds. (R. 329). She used to be fastidious about her house, but now it looked terrible. (R. 334). She allowed that she still vacuumed, did laundry, and cleaned

---

[7](...continued)
*Chater,* 157 F.3d 715, 722 (9th Cir.1998). *See also* discussion of Dr. Pittman's evaluation, *supra* at 3-4.

the bathroom and the kitchen, but just not as often. (R. 335). Her mother cooks for her. (R. 337).

She denied having trouble with authority but said she might be overly sensitive to criticism. (R. 330-31). She was seeing counselors about once a month. (R. 339). She thought that was helping. (R. 340). She was looking forward to starting her teaching training a few months after the administrative hearing. (R 340). Her family seemed to be a main source of her difficulties – she described them as a "black pit" that she was stuck in. (R. 340).

When asked what limitations she had that might prevent her from working, she said she had difficulty focusing. (R. 344). And again, she just was not able to get ready and out the door every morning. (R. 344). She said she thought that if she were working at an office she might have an anxiety attack. (R. 344). She has suffered from anxiety since she was a child. (R. 345). She thought she could do a job where she packed items in boxes all day, but she speculated that she might have a panic attack. (R. 349). Ms. Flynn felt her anxiety was her worst problem, but her doctors kept focusing on her depression. (R. 349-50).

## 2.

### The Vocational Expert's Testimony

Mr. Bobrowski, the vocational expert ("VE"), testified that Ms. Flynn's past work ranged from semi-skilled medium work as a nanny to unskilled medium work at a fast food restaurant. (R. 356). The ALJ asked whether an individual limited to "unskilled, simple, unskilled work" could perform any of Ms. Flynn's past work. (R. 357). The VE said that such an individual could perform Ms. Flynn's past work as a waitress. (R. 357).

If she were "limited more than that to simple, routine, SVP 1 or 2," the individual would not be able to do any of Ms. Flynn's past work. Such a person could, however, perform jobs that exist in significant numbers in the local economy, such as hand packer or bench assembler. It would not matter if such a person could not have more than superficial contact with supervisors, co-employees, or the public, because such positions did not require that. If such a person had to miss more than 3 days of work a month or had periodic crying spells or anxiety attacks, though, they would not be able to perform those jobs. (R. 357).

## III.

## THE ALJ'S DECISION

The ALJ found that Ms. Flynn had not engaged in substantial gainful activity since her amended onset date of January 15, 2004. (R. 15). The ALJ then reviewed the medical evidence and determined that Ms. Flynn had the following severe impairments: anxiety and depression, meaning that they met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. *See* 20 C.F.R. §§404.1520(c). (R. 15). The ALJ determined that Ms. Flynn's psychological impairment resulted in no restriction on activities of daily living or social functioning, mild difficulties in maintaining concentration persistence, or pace, and no episodes of decompensation. (R. 16-17). As such, Ms. Flynn did not have an impairment that, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 30). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ discussed Ms. Flynn's consultative examination results and her record of treatment while hospitalized and attending the public health clinic. (R. 15-16). He noted that upon her discharge, she was assigned a GAF of 58. He added that one examining psychiatrist assigned her a GAF of 38 shortly thereafter, meaning she was unable to function at all in most areas. The ALJ felt this was out of line with the other scores and not supported by the medical evidence of treatment notes at the time, which revealed improvement. (R. 16).[8] The ALJ indicated that he considered Ms. Flynn's complaints in accordance with the regulations and Social Security Rulings. He did not find that Ms. Flynn's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, and that her description of the intensity and limiting effects of those symptoms was not entirely credible. (R. 17). The ALJ also said he was giving significant weight to the review by the Agency physician who found that Ms. Flynn was capable of simple, unskilled work. (R. 17).

The ALJ then noted that the VE testified that Ms. Flynn could return to her past work as a waitress and fast food worker. (R. 17). He further noted that the VE also testified that Ms. Flynn could perform other jobs that existed in significant numbers in the local economy. (R. 18). Accordingly, the ALJ concluded that she was not disabled under the Act. (R. 17).

---

[8] Ms. Flynn's treating doctor was clear that her condition did not restrict her daily activities. In fact, he said there were no work-type situations that would exacerbate her symptoms. He had no opinion on whether Ms. Flynn would be able to function in a competitive work setting. (R. 300-301)

11

# IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Substantial evidence is less than a preponderance but more than a scintilla. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 149 (1997); *Schmidt v. Astrue*, 496 F.3d 833, 841-42 (7th Cir. 2007).

The standard of review in cases such as this is "very deferential," and thus "our role is extremely limited. We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations [citations omitted]. In fact, even if "'reasonable minds could differ concerning whether [plaintiff] is disabled,'" we must nonetheless affirm the ALJ's decision denying her claims if the decision is adequately supported. *Elder v. Astrue*, 2008 WL 2406256 at *4 (7th Cir. 2008).[9]

In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need

---

[9] Of course, deference is not obeisance, and a reviewing court is not a rubber stamp for the Commissioner's decision.

not address every piece of evidence, he cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### B.

### The Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The

Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.

## Analysis

Ms. Flynn suffers from a depressive disorder. The issue is the degree to which it limits her ability to work. The evidence in that regard is somewhat conflicting. At least two of the psychiatric health professionals who spent time with Ms. Flynn found her only moderately or mildly limited in certain respects and unaffected in others. A third found her severely limited, and a fourth, her treating psychiatrist, found her markedly limited in

a few areas but could not say whether she would be unable to work. He allowed that typical work stressors – like dealing with supervisors, co-workers, and the public, as well as time and productivity demands – would not trigger her symptoms. And, he concluded, that no work-type situations would exacerbate her symptoms. *See supra* at 6-7.

It cannot be too often repeated or too strongly emphasized that *disabilities* under the Social Security regulations are not to be confused with *medical conditions* "The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). Here, the ALJ analyzed the evidence and chose which experts to credit, explaining his rationale for doing so. He accepted the evidence that Ms. Flynn was moderately limited, and that despite the fact that she had a college degree and was near completion of her master's degree, concluded that her impairment left her restricted to simple, unskilled work.

That is the ALJ's province; the reviewing court is not to reweigh or resolve conflicts in the evidence nor substitute its judgment for the ALJ's. *See supra* at 13; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). The reviewing court need not even agree with the ALJ's conclusion: so long as reasonable minds might differ as to whether the claimant is disabled, the ALJ's decision must be upheld. *Schmidt*, 496 F.3d at 842.

Ms. Flynn's several criticisms of the ALJ's decision are discussed below.

15

Ms. Flynn first contends that the ALJ erred when he concluded that her psychiatric impairments did not meet the listings at step 3 *(i.e.,* whether the plaintiff has an impairment that meets or equals one of the impairments listed as disabling in the regulations). The listings are a catalog of impairments and associated medical findings; if a claimant meets one of these, she is presumptively disabled and thus entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4)(iii); 404.1520(d); *Berger*, 516 F.3d at 543-44.

The pertinent listing in this case is Listing 12.04 for affective disorders like manic or depressive syndromes. The listing is divided into three sections: A, B, and C. A claimant's impairment may meet it in one of two ways, either satisfying the criteria in *both* sections A and B, or satisfying the criteria in section C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04. Ms. Flynn's initial criticism of the ALJ's consideration of the listing is that he did not discuss section A. This argument is not persuasive. Since the ALJ found Ms. Flynn's impairment failed to meet section B, his failure to discuss section A was meaningless. To meet the listing, Ms. Flynn had to meet *both* sections. Once the ALJ found she did not meet section B, it would have been idle to discuss section A, and the law never demands an empty formality. *Compare Rockstead v. City of Crystal Lake*, 486 F.3d 963, 965-966 (7th Cir. 2006); *Patton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478, 484 (7th Cir. 2007).

Ms. Flynn's better argument is that the ALJ's finding that she failed to meet section B is not supported by substantial evidence. Section B requires that a claimant's psychiatric impairment result in at least two of the following problems: (1) marked restriction in activities of daily living – which Dr. Meccia said did not exist here - and

(2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B.

The ALJ found that Ms. Flynn did not meet these criteria because she had no restriction in activities of daily living; no difficulties in maintaining social functioning; only mild difficulties in maintaining concentration, persistence, and pace; and no recent episodes of decompensation. Accordingly, he did not think her impairment met the listing. Ms. Flynn points out that the doctor who reviewed Ms. Flynn's file for the Agency found mild restrictions in activities of daily living; mild to moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. Ms. Flynn also submits that her treating psychiatrist found her markedly restricted in social functioning and concentration. (Memorandum in Support of Plaintiff's Motion for Summary Judgment, at 8-9).

Importantly, however, neither the Agency reviewer nor the ALJ thought her impairment met the section B criteria, which require marked restrictions in two areas. Under the Commissioner's regulations, a "marked" limitation is defined as "more than moderate but less than extreme." 20 C.F.R. § 404, Subpt. P, App. 1, listing 12.00C. Aside from the Agency reviewer, it can be said that at least two other experts found Ms. Flynn's limitations fell short of the section B criteria. Upon her discharge from her hospitalization in 2004 – which was after the Agency reviewer surveyed her files – she was assigned a GAF of 60, meaning she suffered only moderate, as opposed to the required marked, difficulties. Similarly, her subsequent GAF of 58 from the mental health clinic she attended also fell short of section B requirements. The ALJ made note

17

of both these scores; both provide support for his finding that Ms. Flynn's impairment does not meet listing 12.04, as does the earlier opinion of the Agency reviewer – even though he arguably found her slightly more limited.

**2.**

Ms. Flynn's essential argument is that because there are two reports in the record that support a finding that Ms. Flynn's impairment does meet listing 12.04 the ALJ could not have found that there was substantial evidence supporting his conclusion that she was not disabled. The argument mistakes the standard of review by assuming that a Social Security claimant automatically wins whenever there is any evidence in the record supporting her position. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 9).

Dr. Meccia found that Ms. Flynn had marked difficulties in maintaining social functioning and maintaining concentration, and psychologist Christopher Grunow assigned her GAF scores that indicated she was markedly limited in several areas of functioning. But the issue in cases such as this is not whether there is evidence that in the abstract supports an applicant's claim for benefits. Rather, it is whether there is substantial evidence to support the ALJ's decision. 42 U.S.C. §405(g).

If the rule were otherwise, whenever there was conflicting medical evidence in the record the plaintiff would automatically win. That is quite obviously not the scheme established by the Congress and the Social Security regulations, which envision that conflicts in evidence be resolved by the ALJ after careful review of the entire record. Phrased differently, there is no presumptive nod in favor of a plaintiff merely because there is evidence which when considered in isolation supports the plaintiff.

The ALJ's conclusion in the instant case is amply supported by substantial evidence. There were conflicting assessments from treating, examining, and non-examining sources. The ALJ analyzed all the assessments and chose which to credit, precisely as he was required to do. *See Arnold v. Barnhart*, 473 F.3d 816, 824 (7th Cir. 2007); *Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006). *See also Cowan v. Astrue*, 2008 WL 2421708 at *2 (10th Cir. 2008)("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."); *Brumfield v. Astrue*, 2008 WL 2245704 (9th Cir. 2008).

Moreover, the ALJ adequately explained his choice: the two opinions upon which Ms. Flynn relies conflicted with other medical evidence or were unsupported by any medical facts or findings. Dr. Grunow's GAF score and, more significantly, his GAF score for the year before he saw Ms. Flynn were far out of line with the assessments other treating sources and were not supported by Dr. Meccia's quite contrary findings.

**3.**

Ms. Flynn's next argument is that the ALJ erred by not giving controlling weight to Dr. Meccia's opinion. She relies on Social Security Ruling ("SSR") 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions" (SSA 1996). The SSR is a restatement of the "treating physician" rule set forth in the regulations at 20 C.F.R. § 404.1527(d)(2). *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). The rule directs the administrative law judge to give controlling weight to the medical opinion of a

treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Id.*

Although the rule has been "around for a long time" and cited in enumerable cases, is not a rule of automatic application in favor of plaintiffs, as shown by Judge Posner's opinion for a unanimous panel in *Hofslien v. Barnhart*, 439 F.3d 375 (7th Cir. 2006) – which itself was a case involving claimed depression in which the ALJ properly rejected the testimony of the treating physician, who was a psychiatrist. The court pointed out the "uncertain[ty]" of the rule's meaning and utility. *Id.* at 376. Indeed, the court stressed that the time for re-examination of the rule by the Social Security Administration was at hand. It is worth quoting the court's assessment of the Rule, since it bears significantly on the plaintiff's interpretation and misapplication of the rule:

> Obviously if [the opinion of the treating physician] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.
>
> Where does that leave the administrative law judge? There are two possibilities. One is that, by analogy to presumptions that disappear when evidence in opposition to the presumed fact is introduced ("bursting bubble" presumptions, [citations omitted], the rule drops out and the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh. Another possibility is that his evidence retains a tiebreaker role: if the treating physician's evidence and the contrary evidence are in equipoise, his view prevails. The first seems the more plausible interpretation, as well as being more consistent with the case law; we have found no cases that adopt the equipoise interpretation.
>
> The rule goes on to list various factors that the administrative law judge should consider, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth. The checklist is designed to help the

20

administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much weight to give it, there seems no room for him to attach a presumptive weight to it.

The advantage that a treating physician has over other physicians whose reports might figure in a disability case is that he has spent more time with the claimant. The other physicians whose reports or other evidence are presented to the administrative law judge might never even have examined the claimant (that was true here), but instead have based their evidence solely on a review of hospital or other medical records. But the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits, [citations omitted] will often bend over backwards to assist a patient in obtaining benefits. [citations omitted].

So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances. As explained in the accompanying order, the administrative law judge was justified in giving greater weight to the medical evidence that contradicted the treating physician's evidence than to his evidence.

*Hofslien*, 439 F.3d at 376-377. *See also Zeigler Coal Co. v. Office of Workers' Compensation Programs*, 490 F.3d 609, 616 (7th 2007)("We 'have disapproved any mechanical rule that the views of a treating physician prevail.'...'[T]he treating physician's views may not be accepted unless there is a good reason to believe that they are accurate.'"); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001) ("a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work").

Similarly, the rule does not presuppose that the credibility of treating physicians is not open to challenge. Quite the contrary. While a treating physician may have spent more time with the claimant and thus have advantages over other physicians whose analysis lacks that intimacy and proximity, the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony. "'[A]s is

well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits,' and therefore 'the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.'" *Schmidt*, 496 F.3d at 842.

The ALJ's analysis was faithful to these principles – just not with the results Ms. Flynn desired. Not only did Dr. Meccia not opine on whether Ms. Flynn would be able to function in a competitive work-setting, his statements were internally inconsistent, which is an adequate basis for refusing to give his opinion controlling weight. *See Rudicel v. Astrue*, 2008 WL 2463861 at * 4 (7th Cir. June 19, 2008)(unreported order); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

In addition, Dr. Meccia's statements on which Ms. Flynn relies included no supporting findings. Indeed, Dr. Meccia did not even have notes of treatment which one would expect if Ms. Flynn's claims of disability and debilitation had existed. Dr. Meccia filled out a brief questionnaire and did not go into any depth regarding his treatment of Ms. Flynn. *See Miller v. Commissioner of Social Security Admin.*, 2008 WL 2186357 at *1 (11th Cir.2008)("Good cause [to reject opinion of treating physician] exists where the treating physician's opinion is not bolstered by the evidence, the evidence supports a contrary finding, the physician's opinion is conclusory, or the opinion is inconsistent with the physician's own medical records."); *Brumfield v. Astrue*, 2008 WL 2245704 (9th Cir. 2008)(treating physician's opinions were without detailed explanations or findings); *Bradley v. Astrue*, 2008 WL 2468000 (8th Cir. 2008)(permissible to reject opinions of two

doctors where conclusory and inconsistent with other evidence and with their own findings).

An opinion – whether it be judicial or medical or that of any expert "'has a significance proportioned to the sources that sustain it.'. . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Huey v. United Parcel Service, Inc.,* 165 F.3d 1084, 1087 (7th Cir. 1999). *Cf.* 20 C.F.R. §404.1527(d)(3)("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

In short, the ALJ's decision not to credit Dr. Meccia's opinion is supported by substantial evidence. *See generally Farrell v. Sullivan,* 878 F.2d 985, 989 (7th Cir.1989) ("The ALJ can weigh evidence and make judgments as to what evidence is most persuasive."). And, he adequately explained his reasoning process, which was not based on impermissible or erroneous factors. That is all that is required. *See Schmidt v. Astrue,* 496 F.3d at 842 (ALJ may discount a treating physician's medical opinion "as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.").

**4.**

Next, Ms. Flynn contends that the ALJ failed to make the specific findings required to support his conclusion that she could perform her past relevant work. The ALJ did find Ms. Flynn could return to some of her past work, but nevertheless continued on in the sequential analysis to step five and determined that she could perform other jobs that exist in significant numbers in the local economy. As such, if the ALJ committed any errors at step four, they were harmless. *Prochaska v. Barnhart,* 454 F.3d 731, 735-36 (7th Cir. 2006); *Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir. 2003).

23

Ms. Flynn also contends that because the ALJ did not provide code numbers from the Dictionary of Occupational Titles in his decision, he violated SSR 00-4p. This is a novel argument and, like much of Ms. Flynn's brief, is unsupported by any case law. *See United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008)(arguments unsupported by pertinent authority are forfeited); *330 West Hubbard Restaurant Corp. v. United States*, 203 F.3d 990, 997 (7th Cir.2000) ("In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority . . . ."). In any event, SSR 00-4p does not demand any citation to code numbers and in any event, the DOT is but one of several sources upon which an ALJ may properly rely in reaching a step five determination. 20 C.F.R. § 404. 1566(d). It simply requires the ALJ to inquire about conflicts between vocational expert testimony and the DOT and, if there is one, explain how it was resolved in his decision. *See Prochaska*, 454 F.3d at 735.

The ALJ did make any such inquiry, but there were no conflicts between the VE's testimony and the DOT. (R. 356).[10] As such, it was entirely proper for the ALJ to rely on the VE's testimony in concluding that Ms. Flynn could perform jobs existing in significant numbers in the local economy. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000).

Ms. Flynn's final argument is somewhat off-handed and unsupported by citation to any case. She focuses on the ALJ's hypotheticals to the VE that assumed she would miss three days of work per month and could not remain on task throughout a work day.

---

[10] Notably, at the time of Ms. Flynn's hearing and for five years prior to it, Seventh Circuit precedent made it incumbent upon a claimant's attorney to inquire into any conflicts between the DOT and the VE's testimony at the administrative hearing, or any such argument was forfeited. *See Prochaska*, 454 F.3d at 735 (discussing former law); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir.2002). No such inquiry was made here.

(*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 14). Because the VE said that a person with such limitations would not be able to hold a job, Ms. Flynn argues that the ALJ's decision that she is not disabled is not supported by substantial evidence. Again, both Ms. Flynn's position and the ALJ's decision could be supported by substantial evidence and the ALJ's decision would still have to be upheld.[11] The ALJ posed other hypotheticals to the VE that were supported by the medical evidence and those resulted in testimony supporting a finding of no disability. As such, the ALJ made proper use of the vocational expert's testimony. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

Finally, Ms. Flynn contends that she testified that she would have difficulty concentrating and with regular attendance at a job. "[O]f course, the Administrative law judge did not have to believe" Ms. Flynn. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). *Accord Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir.2006). He was entitled – indeed he was obligated – to determine the validity of Ms. Flynn's testimony. But, making judgments about who is telling the truth is a tricky business. The reviewing court lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("a few minutes observation of the parties in the courtroom is more informing than reams of cold

---

[11] Ms. Flynn submits that the reviewing physician's finding that she had moderate limitations in her ability to maintain concentration and keep up attendance and punctuality support a conclusion that she is *disabled*. But a moderate limitation is not the same as a disability. *See* 20 C.F.R. § 404.1520a. Moreover, the reviewing physician opined that Ms. Flynn was *not disabled* but that her limitations were compatible with simple, routine, unskilled work.

record."). That is why appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is entitled to "special deference." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000).

Credibility determinations cannot be reversed unless the plaintiff can show they are "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006); *Schmidt,* 496 F.3d at 843. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported... can the finding be reversed." *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir.2006). *Cf. Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996)("While these limitations, if accepted as credible, might have supported a disability finding, we will not substitute our opinion for that of the ALJ, who was in a better position to assess Brown's credibility than are we.").

Ms. Flynn has not made any attempt to show that the ALJ made an unsupported or unreasonable credibility determination. Indeed, she has made no argument regarding the ALJ's credibility finding. The ALJ's hypothetical to the VE was entirely appropriate and his subsequent reliance on the VE's testimony was also appropriate. *Schmidt,* 496 F.3d at 845-46 ("ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

# CONCLUSION

The plaintiff's motion for summary judgment or remand [#13] is DENIED, and the Commissioner's motion for summary judgment [#15] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/1/08